| | | |
|---|---|---|
| IN THE MATTER OF ARBITRATION | ) | GRIEVANCE ARBITRATION |
| | ) | |
| between | ) | |
| | ) | Mark Ness - Termination |
| CenterPoint Energy | ) | Grievance |
| Minnesota Gas | ) | |
| | ) | |
| -and- | ) | FMCS Case No. 16-51766-8 |
| | ) | |
| Gas Workers Union | ) | |
| Local No. 340 | ) | September 15, 2016 |

)))))))))))))))))))))))))))))))))))))))))))))))))))))))))))

**APPEARANCES**

**For CenterPoint Energy Minnesota Gas**

Grant T. Collins, Attorney, Felhaber Larson Fenlon and Vogt,
    Minneapolis, Minnesota
Paul J. Zech, Attorney, Felhaber Larson Fenlon and Vogt,
    Minneapolis, Minnesota
Nicholas Wetschka, Manager, Labor Relations
Shane Jones, Area Manager
Christie Singleton, District Director
Terry L. Lefrooth, Supervisor
David Ketchum, Lead Technology Specialist
Cindy Bissonet, Lead System Analyst
Michael Fahey, Former Labor Relations Director

**For Gas Workers Union Local No. 340**

Rockford R. Chrastil, Attorney, Chrastil and Steinberg,
    Minneapolis, Minnesota
Ian "Cecil" Brown, Former President
Roberto Bassat, President
Josh Cleveland, Vice President
Nate West, Master Service Technician
Tim Boettcher, Master Service Technician
Vernon J. Levine, Master Service Technician
Mark Ness, Grievant

**JURISDICTION OF ARBITRATOR**

Article 5, Grievance Procedure, Section 2 of the 2015-2020

Collective Bargaining Agreement (Joint Exhibit #1) between

EXHIBIT 2

CenterPoint Energy Minnesota Gas (hereinafter "CenterPoint," "Employer" or "Company") and Gas Workers Union Local No. 340 (hereinafter "Union") provides for an appeal to arbitration of disputes that are properly processed through the grievance procedure.

The Arbitrator, Richard J. Miller, was selected by the Employer and Union (collectively referred to as the "Parties") from a panel submitted by the Federal Mediation and Conciliation Service ("FMCS"). A hearing in the matter convened on April 8 and May 3, 4, and 20, 2016, at 9:00 a.m. at the FMCS offices, 1300 Godward Street, Minneapolis, Minnesota. The hearing was transcribed with reference being designated as "Tr." followed by the page number of the transcript. The Parties were afforded full and ample opportunity to present evidence and arguments in support of their respective positions.

The Parties' counsel elected to file electronically post hearing briefs with receipt by the Arbitrator no later than August 10, 2016. The post hearing briefs were submitted in accordance with that deadline date. The Arbitrator then exchanged the briefs electronically to the Parties' counsel on August 10, 2016, after which the record was considered closed.

The Parties agreed that the grievance is a decorous matter within the purview of the Arbitrator, and made no procedural or substantive arbitrability claims.

2

**ISSUES AS DETERMINED BY THE ARBITRATOR**

1.  Did the Company have just cause to discharge the Grievant, Mark Ness, on September 14, 2015?

2.  If not, what is the appropriate remedy?

**STATEMENT OF THE FACTS**

CenterPoint is a domestic energy delivery Company that includes electric transmission and distribution, natural gas distribution, competitive natural gas sales and services, and interstate pipelines and field services operations. CenterPoint Home Service Plus® sells service contracts to customers for HVAC systems, such as furnaces, air conditioners, appliances, washers, and dryers. If a customer purchases a service contract, parts and labor are included. CenterPoint also provides HVAC maintenance and repair services for customers without service contracts, and these customers are billed for time and materials.

CenterPoint employs Service Technicians ("Service Techs") to perform repair services. Service Techs are classified by different "levels," depending on their skill level and ability to work on different types of equipment. Service Techs are also dispatched immediately in the event of a gas leak or gas-related emergency.

To schedule a repair, customers contact CenterPoint. CenterPoint attempts to schedule the service repair as soon as

possible - but typically within two days.  However, if jobs are
not being completed on time or if CenterPoint has received a
high volume of service calls, CenterPoint may need to mandate
overtime in order to prevent service calls from being scheduled
more than three days.  This is because customers are less likely
to purchase (or review) their service contracts if they are not
able to receive immediate or near-immediate service.

Service Techs are assigned a Company vehicle that is used
to transport tools and materials to a customer's location.
Service Techs do not report to a central office.  Instead,
Service Techs drive their Company vehicle to a "service area,"
which is a geographical location wherein they are assigned work
at different customer locations.

In addition to their truck, Service Techs are each assigned
a laptop computer.  Since approximately 2012, each laptop
contains a GPS unit (Panasonic CF-31).  The GPS unit runs
continuously while the computer is running and tracks the
computer's location via GPS satellites.  The computer transmits
its GPS coordinates to CenterPoint's computer server, which is
owned by CenterPoint and housed in a separate facility, via
"mobile data," a cellular data link powered by the Verizon 3G
Network.  Like a cell phone, the computer may become briefly
disconnected from the datalink, but the link automatically
reconnects as soon as a cellular signal is identified.

As the continuous GPS data is transmitted from each Service Tech's computer to CenterPoint's server, the Service Tech's latest GPS coordinates can be viewed by managers, dispatchers, and even Union officials by logging into a computer program called "mobile application."  This computer program pulls the most-recent GPS coordinates from each Service Tech's computer and displays each Service Tech's current location on a map, which allows the observer to see a snapshot of one coordinate. A supervisor uses this program to do "spot-checks" regarding the locations of their Service Techs in order to ascertain their worksites.

In addition, CenterPoint's computer server records the Service Tech's GPS coordinates throughout the day.  The server records the GPS coordinates in a field called "PARAM_VALUE" and the time at which the computer registered GPS coordinates in a field called "occurred_at_local." (Union Exhibit #2).  This data can be extracted from CenterPoint's server for each Service Tech.

Unfortunately, the accuracy of the information viewed by a dispatcher or supervisor was dependent upon several factors. First, it was essential that the GPS device was working properly and accurately recording the location of the computer.  This could be affected by the ability of the GPS device to receive and send a signal to satellites, which could be affected by

weather, buildings, trees, and other factors.  This affected the GPS's ability to locate the computer.  The second critical component was the computer's ability to send the information to the Company's mainframes on the Verizon Network.  As with any cell phone service, this connection could be affected by the location of cell phone towers, interference with clouds (weather), trees, buildings and other structures, and the actual equipment and connections in the computer and truck.  The third factor that affects the accuracy of the location information being viewed by a dispatcher or supervisor is the fact that the information on the computer screen being viewed does not automatically change when a Service Tech moves.  In order for the supervisor or dispatcher to see the most recent location transmitted by the Service Tech's computer to the Company's server, they must continually refresh the screen.  If the supervisor or dispatcher fails to refresh the screen, the Service Tech will continue to appear to be located in the same place.  In addition, if the supervisor or dispatcher's screen was refreshed, but the Service Tech's computer did not have an adequate connection to the Company's server via the Verizon Network, the Service Tech would appear not to have moved. Unfortunately, the supervisor's and dispatcher's screens do not reflect whether or not a Service Tech's computer is transmitting properly.

The beginning of a typical day for a Service Tech is first driving to his assigned service area and logging into his laptop. On his computer screen, the Service Tech will see a list of jobs (or customer work orders) that have been assigned to him by his dispatcher, who is assigned one dispatcher for the entire day. Each work order has an "order number," a "promise time and date," which is typically a four-hour window, and "order remarks," which describes the problem the customer is experiencing. (Employer Exhibit #4, p. 3).

After reviewing the order remarks, which are typically one or two sentences, the Service Tech clicks the "enroute" button on his computer indicating that he is driving to this first location. Once he arrives at the customer's residence, the Service Tech clicks or selects the "onsite" button. The Service Tech meets with the customer, diagnosis the issue and, if possible, fixes the problem. If a part is needed, the Service Tech can check to see if he has the part in his vehicle and, if not, he can call CenterPoint's parts warehouse (referred to as "ARPS") to find and order the necessary part. If the part was ordered during the Service Tech's previous visit, the Service Tech will install the part and confirm that the appliance is working properly.

After completing the work or ordering necessary parts, the Service Tech will complete "service person remarks" field on the

computer screen.  These remarks are typically one or two sentences regarding the work completed and/or follow up that is needed for the next visit.  This function may take five to ten minutes depending on the job.  While Services Techs complete the service person remarks while still "onsite," they will typically drive a short distance from the customer's home before completing these remarks.  Doing so prevents the homeowner from approaching them about additional projects and to avoid traffic.

After completing the service person remarks, the Service Tech clicks the "complete" button on his computer screen. Then, if there is another job on the Service Tech's computer screen, the Service Tech will click "enroute" and begin driving to the next job.  If there are no additional jobs on the Service Tech's computer screen, the Service Tech will click a "standby" button, which indicates to CenterPoint that the individual is available to take additional work orders.

If a Service Tech was unable to get service that would allow his laptop to connect to the Company's server at a customer's home, the Service Tech would have to drive his vehicle to a location where he could obtain service to complete his research and/or order parts.

Throughout the day, a Service Tech may be called away from a customer's work order to perform other tasks, such as to respond to an emergency gas leak.  The Service Tech is required

to accurately record these activities in mobile data.  Thus, for example, if a Service Tech needs to fill his vehicle with gas at Super America ("SA"), which has an exclusive fuel contract with the Employer or use the SA restroom as Service Techs are not allowed to use customer bathrooms, the Service Tech is expected to record these activities in mobile data.  During these times, the Service Tech is considered "unavailable," which means that he is not able to take additional work.  It is only when the Service Tech affirmatively designates himself as on "standby" that CenterPoint's dispatchers know that the Service Tech is available to take additional work.

Service Techs are required to keep accurate time records and the Company does not tolerate falsification of timesheets. CenterPoint's Performance Expectations Policy provides that employees are required to "perform the job carefully, diligently, and acceptably all day, every day."  (Employer Exhibit #5, p. 1).  Further, the Standards of Conduct/Business Ethics Policy provides that "no employee is to abandon or leave his job during regular working hours without permission."  Id., p. 2.

Ensuring that accurate time records are kept by Service Techs is important to CenterPoint because: (1) it prevents Service Techs from "padding" or "wasting" time; (2) it helps CenterPoint accurately forecast its operational needs; and (3)

it allows CenterPoint to quickly respond to a gas-related emergency, such as a blowing gas or a house fire, by allowing CenterPoint to identify and dispatch nearby Service Techs.

Because Service Techs work in their service area and without in-person supervision, CenterPoint has to be able to trust that its Service Techs are where they say they are and that they are working.  While CenterPoint monitors each Service Tech's average call times, because each service call is different, it can be difficult to distinguish between thoroughness and time theft.  Nevertheless, because little (if any) work can be performed away from the customer's residence, GPS records is one method to identify Service Techs who are wasting time and creating operational hardship to both customers and the Company.

As a result of these challenges, the Company sought in 2014 and 2015 to increase the rate at which it completed customer orders by: (1) ensuring that dispatchers were assigning work to Service Techs with no work (i.e., who were on "standby" status) and (2) ensuring that Service Techs who had no work were notifying dispatchers of that fact by going on "standby" status. Throughout the summer of 2015, Service Techs were reminded that they needed to update their status in order to notify dispatchers that they were available for additional work. Service Techs were also reminded at staff meetings that their

managers and supervisors can use GPS to double-check their whereabouts. The Company has utilized GPS technology to track Service Techs since 2011.

The accuracy of the information viewed by a dispatcher or supervisor was dependent upon several factors. First, it was essential that the GPS device was working properly and accurately recording the location of the computer. This could be affected by the ability of the GPS device to receive and send a signal to satellites, which could be affected by weather, buildings, trees, and other factors. This affected the GPS's ability to locate the computer. The second critical component was the computer's ability to send the information to the Company's mainframes on the Verizon Network. As with any cell phone service, this connection could be affected by the location of cell phone towers, interference with clouds (weather), trees, buildings, and other structures and the actual equipment and connections in the computer and truck. The third factor that affects the accuracy of the location information being viewed by a dispatcher or supervisor is the fact that the information on the computer screen being viewed does not automatically change when a Service Tech moves. In order for the supervisor or dispatcher to see the most recent location transmitted by the Service Tech's computer to the Company's server, they must continually refresh the screen. If the supervisor or dispatcher

fails to refresh the screen, the Service Tech will continue to appear to be located in the same place.  In addition, if the supervisor or dispatcher's screen was refreshed, but the Service Tech's computer did not have an adequate connection to the Company's server via the Verizon Network, the Service Tech would appear not to have moved.  Unfortunately, the supervisor's and dispatcher's screens do not reflect whether or not a Service Tech's computer is transmitting properly.

The Grievant, Mark Ness, is 58-years old who began his employment with the Company on August 7, 1995.  For over 20 years, and at all times relevant to this matter, Mr. Ness was employed as a Service Tech in the Company's Home Service Plus Department.  After working as an apprentice, Mr. Ness advanced to a Level 1 expert and eventually obtained his master gas fitters competency card.

In addition to working full-time for the Company, Mr. Ness was actively involved in the Union as a Steward for approximately 16 years.  He also volunteered his time to the Company as a mentor for new hires, as a member and co-chair of a safety committee and as a member of a team exploring the establishment of a fireplace installation program.

Mr. Ness' most recent supervisor was Field Operations Supervisor Terry Lefrooth.  On August 20, 2015, Mr. Ness and Union President/Steward Ian Brown were called into a meeting

with Mr. Lefrooth, Shane Jones, the Area Manager and the supervisor of Mr. Lefrooth, and Stephanie Montgomery from the Company's Human Resources Department.  When the meeting started, Mr. Lefrooth began questioning Mr. Ness about work he had done on July 22, August 11, 17 and 19, 2015 (also referred to as "days in question").  Mr. Lefrooth had in front of him four sheets of paper, one for each day, which was prepared by him and alleged to have noted discrepancies between where Mr. Ness appeared to be based on his timesheet/work order entries and where he was shown to appear to have been on Mr. Lefrooth's RN9/supervisor/Go Map screen, which was designed to show the location of Service Techs he supervised.  Mr. Lefrooth did not have Mr. Ness' actual timesheets from the day in question present, he did not have the work order history detail sheets for Mr. Ness' jobs on the days in question and he did not have any maps indicating the locations of Mr. Ness' jobs or the locations where Mr. Lefrooth's computer screen supposedly showed him being.  Moreover, he only had one copy of the documents he had prepared and was using to question Mr. Ness.

After a short time of questioning by Mr. Lefrooth and Mr. Ness being frustrated by trying to respond without adequate information, it became clear the meeting was not going to be productive or meaningful as Mr. Ness and the Union did not have any reasonable idea of the exact allegations against Mr. Ness.

Accordingly, Ms. Montgomery eventually stated that it was clear that the Company needed to get all of Mr. Lefrooth's information organized and resume the meeting at another time so that the allegations could be properly explained and Mr. Ness could have a reasonable opportunity to respond to them.

At the end of the meeting Mr. Ness suggested, since the Company was questioning his whereabouts based on transmissions from his truck and computer, that they take his truck and computer and test them. At that time, Mr. Ness was scheduled to be off for the next three days so he took one of the Company pool cars home. When Mr. Ness returned to work on Monday, August 24th, he intended to get his truck back and proceed to work as usual. Instead, when he met Mr. Lefrooth, Mr. Lefrooth gave him the keys to the truck, but told him that he was being suspended until he received further notification from the Company. Mr. Lefrooth also told Mr. Ness that he should stick around during the week because he was scheduled to work and they could call him at any time.

Mr. Ness, however, did not receive a phone call from Mr. Lefrooth for several days. Finally, on September 14, 2015, 25 days after meeting with Mr. Lefrooth, Mr. Jones and Ms. Montgomery, Mr. Ness received a call from Mr. Lefrooth at about 7:30 a.m. and was told he should report to the Company's 501 Building. When Mr. Ness arrived at Mr. Lefrooth's office, with

a Union Steward he had asked to join him, he was told by Mr. Lefrooth and Mr. Jones that he was being terminated effective immediately "for falsifying your time sheets and Neglect of Duty" and was given a letter of termination setting forth the reasons for his termination. (Employer Exhibit #6). The letter of termination stated that on four dates (July 22, August 11, 17 and 19, 2015) the Company's GPS system indicated that you "were located in parks, at gas stations and other locations contrary to what you entered in your mobile laptop and time sheets." Id. The letter of termination also stated that Mr. Lefrooth met and discussed with Mr. Ness on July 23, 2015, "that the Company has GPS tracking capabilities" and that it is important that you "accurately record your location in the system." Id.

In response, the Union on behalf of Mr. Ness, immediately filed a written grievance protesting Mr. Ness' discharge. (Joint Exhibit #2). The grievance was denied by the Company on September 18 and December 4, 2015. Id. The Union ultimately appealed the grievance to final and binding arbitration pursuant to the contractual grievance procedure.

**COMPANY POSITION**

CenterPoint is not precluded from using and replying upon GPS records in making personnel decisions. Over the course of four days in July and August of 2015, CenterPoint's GPS records

show that Mr. Ness spent approximately six hours neglecting his job duties and/or wasting time in parks and gas stations when he claimed to be working.  Even though Mr. Ness was on notice that his whereabouts were being scrutinized by GPS records, Mr. Ness deliberately manipulated his time record – keeping himself onsite and refusing to go on standby – to prevent CenterPoint from assigning him more work.  During the hearing, Mr. Ness admitted that he does not have a specific memory as to what he did on each of the days in question, and acknowledges that the GPS records are the "best evidence" of his activities on these dates.

Mr. Ness lied at the hearing regarding phantom telephone conversations with his dispatchers.  Mr. Ness' cellphone records reveal that: (1) Mr. Ness never called dispatch on any of the days in question to inform dispatch that he was available for work and (2) Mr. Ness did not spend his hours away from the jobsite trying to locate parts needed to complete work orders.

In this case, CenterPoint has demonstrated that Mr. Ness engaged in both neglect of duty and dishonesty over the course of four days in July and August of 2015.  Specifically, CenterPoint has shown that over the course of these four days, Mr. Ness spent at least six hours away from his jobsite and not performing any work, while still claiming that he was performing work for CenterPoint's customers.  At times, Mr. Ness was more

than 10 miles away from where he claimed to be at a customer's worksite.

The Union failed to present sufficient evidence of disparate treatment. Consequently, termination is justified in this case because: (1) Mr. Ness' falsification was deliberate; (2) it was motivated by personal gains; (3) it adversely affected other Service Techs; (4) it jeopardized public safety and CenterPoint's ability to respond to a gas-related emergency; (5) it made him unfit to work as a Service Tech because he can no longer be trusted to accurately record his time and location; and (6) Mr. Ness' lack of candor throughout the investigation process and during the arbitration hearing.

Accordingly, since Mr. Ness engaged in both neglect of duty and dishonesty he is subject to termination pursuant to the absolute cause provision of Article 26 of the Contract. Nevertheless, even if the Arbitrator fails to find that these events constitute absolute cause, Mr. Ness' misconduct certainly rises to the level of just cause.   In any event, the Arbitrator should dismiss the grievance in its entirety.

**UNION POSITION**

The Company has the burden by proof beyond a reasonable doubt or at least by clear and convincing evidence to prove that Mr. Ness was guilty of neglect and/or dishonesty on the days in question.

For over 20 years Mr. Ness was a productive and loyal employee of the Company.  He has no history of discipline or performance problems and he served as a Union Steward for many years.

The Company denied Mr. Ness due process rights when Mr. Lefrooth never contacted Mr. Ness or even attempted to contact Mr. Ness when he allegedly suspected that Mr. Ness was not where he should be on the dates of July 22, August 11, 17 and 19, 2015.  In addition, the Company never gave Mr. Ness the opportunity to explain his whereabouts on those days in question.  Finally, the Company violated Mr. Ness' due process rights by submitting, and/or allowing to be submitted, an investigatory report to upper level decision makers that failed to include accurate and complete information regarding the August 20, 2015 meeting and other aspects of the investigation.

The Company terminated Mr. Ness on the basis of its determination that on four separate days he was guilty of falsifying his time sheet and neglect of duty.  Accordingly, the Company bears the burden of proving that each and every allegation of falsification and neglect of duty is true.  If the Arbitrator determines that the Company has failed to prove each and every claimed incident of falsification and neglect of duty, the discharge must be overturned and Mr. Ness reinstated to his job with full back pay and seniority.  It cannot be presumed

that the Company would have terminated Mr. Ness based on alleged misconduct that incurred on only one of the days, or two of the days or even three of the days.

Based on the facts and Mr. Ness' credible testimony of what he recalls happening, it is clear that the Company has failed to prove that Mr. Ness was being honest, falsifying his timesheets or neglecting his duty on the days in question.  In fact, it is hard to imagine a case where the evidence is so insufficient to support such serious accusations.  And it is hard to imagine a case where the Company's deliberate refusal to give an employee a chance to explain his whereabouts and actions are so blatantly unfair.

The Company discriminated against Mr. Ness on the basis of his age and/or Union affiliation.  In this case, at 59 years-old, Mr. Ness is one of the Company's older employees and is in the protected age group.  He was also a Union Steward, which is a protected classification under the Collective Bargaining Agreement.  Mr. Ness was treated differently when his supervisor failed to contact him about his whereabouts and in instances where there was proven misconduct and the employees only received a warning or a short suspension.  Accordingly, there is no reasonable explanation for the Company's treatment of Mr. Ness other than discrimination or some other equally inappropriate motivation.

The Company cannot rely on GPS alone to prove that Mr. Ness was dishonest since it does not provide sufficient information, and is very imperfect.

The Company did not prove that Mr. Ness did not maintain contact with dispatch preventing Mr. Ness was being assigned additional work.

The Company's claim that the Arbitrator does not have the authority to modify the penalty imposed is without merit and must be rejected.  The language of Article 26 must be read narrowly if the provision is to have its intended effect, which is to protect employees from discipline which is without just cause, or that is arbitrary or discriminatory.

Based on the evidence presented at the hearing, it is clear that the Company did not treat Mr. Ness fairly, consistently or appropriately with regard to the Company's perceived discrepancies between his daily timesheets and his physical location at certain times, as determined by the Company's imperfect and unreliable GPS tracking program.  There simply was no just cause to terminate Mr. Ness.

Based upon the foregoing, the grievance should be sustained and the Arbitrator should rule accordingly.  The discharge should be reversed and Mr. Ness should be reinstated to his former position with the Company with full back pay, benefits and seniority.

**ANALYSIS OF THE EVIDENCE**

The Company's right to discipline an employee, including discharge, appears in Article 26, Discipline and Discharge, of the Contract as follows:

> The Company has the right to employ or promote in accordance with the provisions of this Agreement, to enforce discipline, to discharge employees for cause, including failure to recognize authority, to discharge or discipline new employees with or without cause before they shall have completed their applicable probationary period (such new employees retain the right to file grievances alleging contractual violations). Without excluding other causes for discharge, the following shall constitute absolute causes from which there shall be no appeal to negotiation or arbitration between the Company and the Union (except that the question of whether the employee has been guilty of the facts constituting such absolute causes shall be a negotiable controversy) namely:
>
> 1. Use of, or being under the influence of; alcohol or non-medical drugs at any time during the work day
> 2. Dishonesty
> 3. Neglect of Duty
> 4. Abuse of Sick Leave

Because of the magnitude of the discharge penalty, the burden of proof rests on the Company to justify Mr. Ness' termination for dishonesty or neglect of duty, which were the reasons given in his termination letter. "Burden" and "quantum" of proof are two of the most involved aspects of the rules of evidence which ordinarily are eschewed by arbitrators as being so complicated, theoretical and technical that they are generally unsuitable for such a relatively informal process. Consequently, rather than assigning to this case a quantum of

required proof, such as proof beyond a reasonable doubt, preponderance of the evidence, clear and convincing evidence or evidence sufficient to convince a reasonable mind of guilt, a better and more realistic approach to take is a determination of whether Mr. Ness was guilty of dishonesty or neglect of duty and, if so, was his misconduct the type serious enough to justify his discharge.

The gist of this case is a determination of Mr. Ness' whereabouts while working on July 22, August 11, 17 and 19, 2015.  Contrary to the Union's argument, the Company is not required to prove that Mr. Ness is guilty of dishonesty or neglect of duty involving each and every instance cited in the termination letter.  The Company is only required to prove that Mr. Ness was guilty of dishonesty or neglect of duty on some of the days in question and, not on all of these days, in order to discipline him.

The Company relies on the GPS technology located in Mr. Ness' laptop computer to substantiate their claim that Mr. Ness neglected his duties and was dishonest when he spent more than six hours sitting in parks and gas stations, neglecting his work duties and misrepresenting his whereabouts on his time records over the course of the days in question.

Since approximately 2012, every Service Tech, including Mr. Ness, have possessed a Company-owned laptop computer containing

a GPS unit.  In a nutshell, the GPS unit runs continuously while the computer is running and tracks the computer's location via GPS satellites.  The computer transmits its GPS coordinates to CenterPoint's computer server via mobile data, a cellular data link provided by Verizon 3G Network.  The Service Tech's latest GPS coordinates can be viewed by managers, dispatchers and even Union officials by logging into the mobile application computer program, which provides the most-recent GPS coordinates from each Service Tech's computer and displays each Service Tech's current location on a map.  This feature was used by Mr. Lefrooth to do spot-checks regarding the locations of the Service Techs assigned to him, including Mr. Ness.

In addition, CenterPoint's computer server records the Service tech's GPS coordinates throughout the day in a field called PARAM_VALUE and the time at which the computer registered GPS coordinates in a field called "occurred_at_local."  That is, regardless of when the data is transmitted from the laptop to CenterPoint's server, the GPS server data accurately reflect to the position of the laptop at the time.  This data can be extracted from CenterPoint's server for each Service Tech.

The Company made it decision to terminate Mr. Ness based on a comparison of his time sheets and the mobile data terminal ("MDT") computer records generated by Mr. Ness' entries on work orders compared to his GPS location.  The Arbitrator spent

countless hours studying the GPS data, time sheets and MDT computer records regarding the whereabouts of Mr. Ness on the days in question, recognizing the Union's concern that GPS data is not always absolutely accurate, and the fact that Service Techs did not always perform or complete all work associated for a customer or on a work order while they were on site. Thus, according to the Union, the comparison of MDT records and the GPS locations would not in fact establish that the Service Tech, including Mr. Ness, was not performing work related to the work order even though he was located somewhere else.

The events that resulted in Mr. Ness' termination occurred first on July 22, 2015. On that date, Mr. Lefrooth observed Mr. Ness via CenterPoint's GPS system spending excessive time at the American Legion in Apple Valley and in a gas station parking lot while Mr. Ness claimed on his timecard to be working. In fact, the GPS records showed that Mr. Ness spent at least 45 minutes sitting in a gas station parking lot when he claimed to be working.

On July 22, 2015, Mr. Ness was dispatched a service call at 14820 Autumn Place, Burnsville, MN 55306 ("Autumn Place"). (Employer Exhibit #4, p. 3). According to his time records, Mr. Ness started driving at 12:54 p.m. and arrived at 1:13 p.m. Mr. Ness recorded that he left the Autumn Place location at 2:58 p.m. Id.

According to Mr. Lefrooth, he wanted to meet Mr. Ness for lunch, so at approximately 11:15 a.m. or 11:30 a.m., he looked up Mr. Ness' GPS location on his computer.  Mr. Lefrooth observed that Mr. Ness was at the American Legion in Apple Valley, so he thought Mr. Ness was already at lunch.  Later that afternoon, Mr. Lefrooth observed that Mr. Ness was still at the American Legion.  Specifically, at 1:49 p.m., 2:00 p.m., and 2:10 p.m. Mr. Lefrooth observed Mr. Ness at the American Legion. (Employer Exhibit #4, pp. 5-7).  Then, at 2:30 p.m., 2:39 p.m., and 3:07 p.m. Mr. Lefrooth observed Mr. Ness at the Super America gas station, which is located at 1221 County Road 42 East, Burnsville, MN 55306.  (Employer Exhibit #4, pp. 8-10). Mr. Lefrooth used his computer to take screenshots of Mr. Ness' whereabouts during these times.

GPS Records saved on CenterPoint's server confirm that Mr. Ness was not at the Autumn Place location from 1:13 p.m. to 2:58 p.m.  (Employer Exhibit #10).  Specifically, CenterPoint's GPS server data shows that Mr. Ness drove to a nearby park at approximately 2:18 p.m., and then traveled to the Super America gas station from 2:25 p.m. to 2:58 p.m.  Id.

At 2:58 p.m. on July 22, 2015, Mr. Ness reported that he began driving to his next service call, which was located at 15682 Fjord Avenue, Apple Valley, MN 55124 ("Fjord Avenue"). (Employer Exhibit #4, p. 4).  Mr. Ness reported that he arrived

at 3:12 p.m. and completed his work at 5:30 p.m.  Id.  According
to his service remarks, Mr. Ness noted that he "went to Dey
Appliance" to pick up a part and then returned to install the
part, which were confirmed by CenterPoint's GPS server data.
Id., p. 1.  Yet, the GPS server records do not show Mr. Ness
staying at the Fjord Avenue location until 5:30 p.m.  Instead,
they show that Mr. Ness left the location at approximately 4:45
p.m. and then drove to a Holiday gas station.  Id.  After
spending more than 45 minutes away from his worksite, Mr. Ness
finally notified CenterPoint that he was available to take more
work at 5:30 p.m. by changing his status to "standby," which
indicated to dispatch that he was available to take more work.
(Employer Exhibit #3, p. 2).

     The Union's response is that when Mr. Ness arrived at the
American Legion at approximately 12:00 p.m. he had no other work
assigned to him.  The next assignment he received was at 12:42
p.m. for the job at Autumn Place.  No additional jobs were
assigned to him at that time.  The next job assigned to him was
at 2:58 p.m. when he was assigned the job at Fjord Avenue and he
arrived at that site at 3:12 p.m.  Accordingly, although Mr.
Ness may have been at the Super America from 2:31 to 3:07 p.m.,
he did not say that he was working at a job on Fjord Avenue
during that time, but rather he was performing related work at
the gas station.

The Union argues that what appears to have occurred is that Mr. Ness finished his morning jobs and all the work that was assigned to him and went to the American Legion for lunch. After lunch, he received an assignment from dispatch for the job at Autumn Place, finished work there and then drove to the Super America to complete his paperwork and wait for another assignment. After he received the assignment to Fjord Avenue, at 2:58 p.m. he left shortly thereafter and arrived at the Fjord Avenue location at 3:12 p.m.

The next day, on July 23, 2015, Mr. Lefrooth met with Mr. Ness to have lunch. After their lunch, Mr. Lefrooth told Mr. Ness that Service Techs are being watched via GPS to verify their locations so "everybody needs to be where they are when they say they are, because not only am I watching it, but so is upper management and dispatch." (Tr. 78). Mr. Ness, who was a Union Steward at the time, responded: "I'll get the word out." (Tr. 89, 99). Mr. Ness testified that if he saw other Service Techs in the field he would tell them about Mr. Lefrooth's warning. (Tr. 659).

On August 11, 2015, Mr. Ness was dispatched a service call at 3711 South Hills Lane, Eagan, MN 55123 ("Hills Lane"). According to his time records, Mr. Ness began driving to Hills Lane at 10:18 a.m. and arrived at 10:41 a.m. (Employer Exhibit #4, p. 60). Then at 11:51 a.m., approximately 70 minutes after

arriving onsite, Mr. Ness documented that he left Hills Lane and began his lunch break.   Id.

CenterPoint's GPS records do not substantiate Mr. Ness' time records.   According to Mr. Lefrooth's GPS records, Mr. Ness was observed near the Eastview Athletic Park at approximately 11:28 a.m., which is more than 8 miles from Hills Lane location.   (Employer Exhibit #4, p. 64).   Then, at 11:38 a.m., Mr. Lefrooth observed Mr. Ness at a retail mall location near County Road 42, which was more than 10 miles from Hills Lane.   (Employer Exhibit #4, pp. 65-66).   During his testimony, Mr. Ness admitted that he liked to have lunch at a Dairy Queen located at the mall.   (Tr. 663).

Mr. Lefrooth's observations are supported by GPS data saved on CenterPoint's server.   Specifically, the data show that Mr. Ness left the Hills Lane location as early as 11:07 a.m. - not 11:51 a.m.   (Employer Exhibit #10, p. 1).   In fact, it was not until 12:20 p.m. - one hour and 13 minutes after GPS records show he left Hills Lane - that Mr. Ness reported that he took a 15 minute break.   (Employer Exhibit #3, p. 3).   Yet, Mr. Ness' break did not end at 12:35 p.m. because GPS records show that he remained at the strip mall until 12:58 p.m.   (Union Exhibit #2, p. 2).   Thus, the GPS records indicate that Mr. Ness was at the strip mall more than one hour, which is considered to be a lengthy period of time.

Meanwhile, on August 11, 2015, at 11:02 a.m., Mr. Ness was dispatched a service call at 12312 Michelle Circle, Burnsville, MN 55337 ("Michelle Circle").  (Employer Exhibit #4, p. 61). After his lunch, Mr. Ness reported that he started driving to Michelle Circle at 12:35 p.m. and arrived at 1:05 p.m.  Id. According to his time records, in addition to his initial work order, Mr. Ness also completed two "add-tos" for Michelle Circle and reported that he left the residence at 2:44 p.m.  (Employer Exhibit #4, p. 62-63).  However, the GPS records show that Mr. Ness left Michelle Circle approximately one hour before he reported his job complete.

According to Mr. Lefrooth's GPS records, Mr. Ness was observed at the Terrace Oaks West Park at approximately 1:54 p.m., which is more than one mile from the Michelle Circle location.  (Employer Exhibit #4, pp. 67-71).

On August 12, 2015, Mr. Lefrooth contacted the customer at the Michelle Circle location, and asked him how long Mr. Ness was at his residence.  The customer reported that Mr. Ness was onsite for approximately 30 minutes.  (Tr. 60; Employer Exhibit #4, p. 61).

Both Mr. Lefrooth's GPS records and the customer's observations were supported by GPS data saved on CenterPoint's server.  Specifically, the data show that Mr. Ness spent approximately 48 minutes at the customer's residence, and spent

the remainder of his time (approximately one hour) at Terrace Oaks West Park.

The Union's response is that according to Mr. Ness' time sheet and time entries placed on the work order for Hills Lane, he went on route to the site at 10:18 a.m., arrived or went on site at 10:41 a.m. and completed the job, including any necessary paperwork at 11:51 a.m.  According to the GPS records discovered by the Company the day prior to the start of the arbitration, Mr. Ness left the Hills Lane job site at about 11:07 a.m. and began driving to a commercial area at 150th and South Cedar Avenue, arriving at approximately 11:36 a.m., some 29 minutes later.

According to the Union, after arriving at 150th and Cedar, it appears that Mr. Ness logged on to his computer and did his paperwork for the job at South Hills Lane and other work-related items until 11:51 a.m., at which time he completed and sent the paperwork for Hills Lane.  After completing his paperwork, checking his computer, etc., Mr. Ness took his lunch break from 11:52 a.m. until 12:35 p.m., combining his morning 15 minute break with his half hour lunch break, for a total of 45 minutes. (Employer Exhibit #3, p. 2).  Although Mr. Ness left the work site at Hills Lane and drove to 150th and Cedar before completing his paperwork, nothing he did suggests that he was falsifying his time sheet or work, that he was trying to avoid

work or that he took a longer lunch than he was entitled to.
The time was spent driving, completing paperwork and checking
his computer for messages, etc.  Moreover, if Mr. Lefrooth had
any question about what Mr. Ness was doing at that time, since
he clearly believed he was at a location other than where he
should have been, he could have easily called or sent Mr. Ness a
message asking him what he was doing and why he had driven to
150th and Cedar prior to completing his paperwork.

In regards to Michelle Circle, the Union avers that Mr.
Ness was at this location from 13:04 p.m. to 13:50 p.m., a total
of 46 minutes and no GPS signals were being transmitted from Mr.
Ness' computer to the Company's server or otherwise from 13:10
p.m. to 13:50 p.m.  (Union Exhibit #2; Employer Exhibit #10).
After leaving the Michelle Circle job at approximately 13:50
p.m., Mr. Ness did drive to a parking lot for Terrace Oaks East
Park, where he was able to get service, research the parts
needed for the customer at Michelle Circle and complete his
paperwork on the three separate orders that needed to be
created.  According to the work orders and time entries created
by Mr. Ness, he spent approximately 45-50 minutes doing this
work, which included creating an "add to" work order for
additional work that had been requested by the customer while
Mr. Ness was on site.  Accordingly, although Mr. Ness was in
fact in the parking lot of Terrace Oaks Park East from about

31

1:53 p.m. to 2:44 p.m., the work orders completed by Mr. Ness and the GPS coordinates, which show that Mr. Ness entered a work order at 2:43 p.m. for Michelle Circle prove that he was in fact working at that time on this job.

The date of August 17, 2015, included three alleged instances where Mr. Ness was accused by the Company of being dishonest or neglect of duty.  The first instance the Company alleges is 40 minutes of missing time by Mr. Ness.  Early in the morning on August 17, 2015, Mr. Ness was dispatched a service call at 12808 Apple View Lane, Burnsville, MN 55337 ("Apple View Lane").  According to his time records, Mr. Ness began driving to Apple View Lane at 1:35 p.m. and arrived at 1:58 p.m. (Employer Exhibit #4, p. 42).  Then at 2:54 p.m., 56 minutes after arriving onsite, Mr. Ness reported that he left Apple View Lane.  Id.

According to Mr. Lefrooth's GPS records, however, Mr. Ness was observed at Terrace Oaks West Park both before he arrived at Apple View Lane (at 1:54 p.m.) and after he left the customer's residence (at 2:39 p.m. and 2:48 p.m.).  (Employer Exhibit #4, pp. 45-47).  Specifically, the GPS data shows that Mr. Ness left the Apple View Lane location at approximately 2:13 p.m. and drove to Terrace Oaks West Park.  (Employer Exhibit #10, p. 2).  The GPS data shows that Mr. Ness stayed at the Terrace Oaks West Park until 2:59 p.m.  Id.

The second instance on August 17, 2015, resulted in the Company alleging missing time by Mr. Ness amounting to 1 hour and 5 minutes.

On August 17, 2015, Mr. Ness was dispatched a service call at 6301 137th Street West, Apple Valley, MN 55124 ("137th Street"). According to his time records, Mr. Ness began driving to the location at 2:54 p.m. and arrived at 3:09 p.m. (Employer Exhibit #4, p. 43). Then, even though the service call was for a refrigerator and Mr. Ness testified that he does not fix refrigerators, Mr. Ness purported to spend one hour and five minutes onsite. He recorded that he did not leave 137th Street until 4:14 p.m. Id.

Although Mr. Lefrooth did not document Mr. Ness' movements during this time, GPS data saved on CenterPoint's server show that Mr. Ness spent no more than a few minutes at 137th Street. Specifically, the GPS records show that Mr. Ness left the location at 3:19 p.m. and then spent more than one hour at a Holiday gas station. (Employer Exhibit #10, p. 2). The gas station is more than 2 miles from the 137th Street location. (Employer Exhibit #4, p. 48).

The third instance on August 17, 2015, resulted in the Company claiming that Mr. Ness had missing time of 1 hour. Mr. Ness' next jobsite on August 17, 2015, was at 15710 Frisian Lane, Apple Valley, MN 55124 ("Frisian Lane"). According to Mr.

Ness' time records, he started driving at 4:16 p.m. but did not arrive until 5:14 p.m. - approximately one hour later. (Employer Exhibit #4, p. 44).  Then, according to Mr. Ness, he finished his work at 5:38 p.m.  Id.  Mr. Ness' service remarks reflect that he cancelled the order because it started raining. Id.

Mr. Lefrooth's GPS records show that rather than driving to the Frisian Lane location at 4:16 p.m., Mr. Ness spent approximately one hour sitting in the parking lot of a Holiday gas station.  Specifically, at 4:31 p.m., 4:54 p.m., and 5:05 p.m. Mr. Lefrooth recorded Mr. Ness' location at the Holiday Gas Station.  (Employer Exhibit #4, pp. 48-50).  It was not until 5:16 p.m. that Mr. Lefrooth recorded Mr. Ness arriving at the Frisian Lane location.  (Employer Exhibit #4, pp. 52-53).

GPS data saved on CenterPoint's server confirm that Mr. Ness spent little or no time at Frisian Lane.  Specifically, the GPS data show that Mr. Ness did not leave the Holiday Gas Station parking lot until after 4:51 p.m. - approximately 45 minutes after he claimed he started driving.  (Employer Exhibit #10, pp. 2-3).

Then, although Mr. Lefrooth did not document Mr. Ness' location after 5:19 p.m., CenterPoint's GPS server data show that Mr. Ness left the Frisian Lane location shortly after 5:19 p.m. and drove to the Kwik Trip parking lot.  (Employer Exhibit

#10, p. 3).  It was not until 5:38 p.m., 24 minutes after leaving the Frisian Lane location, that Mr. Ness finally went on "Standby" to notify CenterPoint that he was available for additional work.  (Employer Exhibit #3).

The Union alleges that there is no merit to Mr. Lefrooth's claim with regard to August 17, 2015, that Mr. Ness was not working and falsifying his time sheets relative to three separate jobs.  As to the first job at Apple View Lane, Mr. Ness was terminated because Mr. Lefrooth observed Mr. Ness, via his GPS supervisor's screen at Terrace Oaks East Park from 2:17 p.m. to 2:48 p.m., a total of 31 minutes.  On Mr. Ness' time sheet, he indicated that he was doing the Apple View Lane job from 1:58 p.m. to 2:54 p.m.  Union Exhibit #2 reflects that Mr. Ness arrived at Apple View Lane at approximately 1:58 p.m. and at approximately 2:13 p.m. Mr. Ness drove to the parking lot at Terrace Oaks East Park, which was no more than a couple blocks from the work location at Apple View Lane.  According to the work order for Apple View Lane, Mr. Ness determined that the customer needed parts for his air conditioner and then proceeded to identify the parts that were needed, ordered them and completed his paperwork.

The GPS records for the period after Mr. Ness arrived at Terrace Oaks Park at 2:13 p.m. reflect that no GPS coordinates were transmitted by his computer between 2:13 p.m. and 2:59 p.m.

The coordinates transmitted at 2:59 p.m. indicated that Mr. Ness was no longer at Terrace Oaks Park East, he was driving. Accordingly, although Mr. Lefrooth claims that his GPS supervisor screen proved that Mr. Ness was at Terrace Oaks Park from 2:17 p.m. to 2:48 p.m., this fact is not confirmed with the GPS coordinates recorded on the Company's server (Union Exhibit #2). The Union alleges that Mr. Lefrooth's computer placed Mr. Ness at Terrace Oaks Park during this time because Mr. Ness' computer was not getting service and sending updated coordinates to the Company's server and system.

The Union also claims that even if Mr. Ness was at Terrace Oaks Park during this entire time frame, this does not prove that he falsified his time sheets. It is clear that he was required to do research on parts, order parts and complete his paperwork after he left Apple View Lane. There was nothing that prohibited him from driving two blocks to Terrace Oaks Park to do this work. Thus, according to the Union, the Company clearly has not proven that Mr. Ness falsified his time sheets and neglected work with regard to the Apple View Lane job.

With regard to the Company's claim that Mr. Ness falsified his timesheet by claiming he was on site at 137th Street site when Mr. Lefrooth's GPS showed him at Terrace Oaks East Park from 2:55 p.m. - 3:00 p.m., and that he was at the Frisian Lane site when Mr. Lefrooth's GPS showed him at the Holiday Station

from 4:13 p.m. - 5:06 p.m., the record refutes that claim as

follows:

1.   That no GPS coordinates were generated from Mr. Ness'
     computer for the period when he was driving at 2:59
     p.m. until 3:19 p.m., except when he went on site at
     3:09 p.m.;

2.   That the order for a gas stove repair at 137th Street
     was dispatched to Mr. Ness at 11:25 a.m. on August 17,
     2015. (Employer Exhibit #4, p. 43);

3.   That Mr. Ness called the customer at 2:57 p.m. to
     arrange to meet, but that the customer was not home.
     (Employer Exhibit #4, p. 43);

4.   That Mr. Ness met with the customer and discovered that
     the part that had arrived was for a refrigerator.
     (Employer Exhibit #4, p. 43);

5.   That Mr. Ness did not do refrigerator repairs.
     (Employer Exhibit #4, p. 43);

6.   That Mr. Ness explained the situation to the customer
     and advised the customer that he would arrange for
     someone else to come out the next day.  (Employer
     Exhibit #4, p. 43);

7.   That Mr. Ness contacted dispatch to set up an
     appointment for another technician to repair the
     refrigerator the next day.  (Employer Exhibit #4, p.
     43);

8.   That Mr. Ness had no other work assignment that had
     been dispatched to him at that time.  (Employer Exhibit
     #4, p. 44);

9.   That it was a cool day and had started to rain after he
     dealt with the customer at 137th Street.  (Employer
     Exhibit #4, p. 44);

10.  That Mr. Ness checked with dispatch and drove to the
     Holiday station to wait for an assignment.  (Employer
     Exhibit #4, p. 44);

11. That Mr. Ness wrote up the paperwork for the job at 137th Street. (Employer Exhibit #4, p. 44);

12. That the next work assignment dispatched to Mr. Ness was at 4:15 p.m. for Frisian Lane. The work order was for an air conditioner. (Employer Exhibit #4, p. 44);

13. Mr. Ness waited at the Holiday Station for the rain to stop so he could do the air conditioner job. (Employer Exhibit #4, p. 44);

14. Mr. Ness had no other work assignment that had been dispatched to him at that time. (Employer Exhibit #4, p. 44);

15. At 5:15 p.m., Mr. Ness called the customer at Frisian Lane to cancel the order and reschedule it for the following Thursday afternoon. (Employer Exhibit #4, p. 44);

16. Mr. Ness set up a new appointment for the customer and completed his paperwork for the work order at 5:38 p.m. (Employer Exhibit #4, p. 44);

17. At the time Mr. Ness completed the work order for Frisian Lane and went on "standby" he did not have any other jobs assigned to him. (Employer Exhibit #4, p. 44).

The Company alleges that Mr. Ness is guilty of two instances of missing time on August 19, 2015 - one 1 hour and 12 minutes and the other 30 minutes.

On August 19, 2015, Mr. Ness was dispatched a service call at 3815 Laurel Court, Egan, MN 55122 ("Laurel Court"). According to his time records, Mr. Ness began driving to the location at 10:37 a.m. and arrived at 10:59 a.m. (Employer Exhibit #4, p. 21). At 12:04 p.m., Mr. Ness completed an "add-to" to the order, noting that parts were needed and that the

customer should "call when parts arrive." (Employer Exhibit #4,
p. 22). The "add-to" order shows that Mr. Ness left the Laurel
Court location at 12:40 p.m. - approximately 2 hours after he
arrived. Id.

However, Mr. Lefrooth's GPS records show that Mr. Ness
spent less than one hour at Laurel Court. Specifically, from
11:48 a.m. to 12:16 p.m. Mr. Lefrooth observed Mr. Ness in the
parking lot of a Kwik Trip gas station in Apple Valley, MN —
more than five miles from Laurel Court. (Employer Exhibit #4,
pp. 24-28). Then, beginning at approximately 12:16 p.m., Mr.
Lefrooth observed Mr. Ness at a Holiday gas station. (Employer
Exhibit #4, pp. 29-30). At this point, Mr. Ness had traveled
more than 10 miles from the Laurel Court location. Id. Mr.
Ness also could not have been refueling his truck because
CenterPoint's contracted fuel provider is Super America.

CenterPoint's GPS server data confirms Mr. Lefrooth's
observations. First, the server data show that Mr. Ness left
the Lauren Court location at approximately 11:28 a.m. and drove
to the Kwik Trip parking lot. (Employer Exhibit #10, p. 3).
Then, at 12:21 p.m., Mr. Ness drove to a Holiday gas station.
Id.

Even though his time records continued to place him at
Laurel Court, CenterPoint's GPS records then show him driving to
a parking lot at Johnny Cake Ridge Park East. (Employer Exhibit

#10, p. 3).  Mr. Ness then took his lunch break from 1:10 p.m.
to 1:25 p.m.  (Employer Exhibit #3).

The second instance on August 19, 2015, occurred after Mr.
Ness took his lunch break.  Mr. Ness' records reflect that he
began traveling to his next jobsite, 14739 Embry Path, Apple
Valley, MN 55124 ("Embry Path") at 1:25 p.m. and arrived at 1:44
p.m.  (Employer Exhibit #4, p. 23).   Mr. Ness reported that he
left the Embry Path location at 2:41 p.m. approximately one hour
later.  Id.  However, Mr. Lefrooth observed that Mr. Ness
remained in Eastview Athletic Park until at least 1:53 p.m.
(Employer Exhibit #4, pp. 31-34).   It does seem odd that it
would take more than 19 minutes to travel approximately one
mile.

The Union argues that in regard to the two jobs on August
19, 2015, where Mr. Lefrooth believed that Mr. Ness was not
working and falsifying his time sheets relative to two separate
jobs, a review of the records indicates that there is no merit
to this claim.

According to Mr. Lefrooth and the termination letter, Mr.
Ness was terminated for falsifying his time sheet relative to
the Laurel Court job because Mr. Lefrooth observed Mr. Ness, via
his GPS supervisor's screen at a Kwik Trip from 11:48 a.m. to
12:36 p.m. when his MDT records showed him being on site at
Laurel Court.  The Union claims that Mr. Ness was not guilty of

40

falsifying his timesheets or neglect of duty relative to this job for the following reasons:

1. The job was dispatched to Mr. Ness at 9:09 a.m. on August 19, 2015.  (Company Exhibit #4, p. 21);

2. The work order was for the repair of a gas range. (Company Exhibit #4, p. 21);

3. Mr. Ness went en route to the job at 10:37 a.m. (Company Exhibit #4, p. 21);

4. Mr. Ness arrived on the job at 10:59 a.m.  (Company Exhibit #4, p. 21);

5. Mr. Ness installed a module on the range, but the burner was still not working.  It took him approximately 30 minutes to install the module. (Company Exhibit #4, p. 21);

6. After installing the module Mr. Ness left the job and drove to the Kwik trip to create an "add to" for the job and order additional parts.  He arrived at the Kwik Trip at approximately 11:38 a.m.  (Union Exhibit #2; Employer Exhibit #10);

7. After arriving at the Kwik Trip, Mr. Ness continued working on the Laurel Court job, researching the additional parts he needed to repair the range, ordering the parts, creating a new order for completing the repair and completing all the paperwork.  (Company Exhibit #4, pp. 21-22);

8. Mr. Ness created the "add to" or new order at 12:04 p.m.  (Company Exhibit #4, p. 21);

9. At approximately 12:21 p.m., Mr. Ness left the Kwik Trip and drove to the Holiday station nearby.  He believes he may have gone there to pick up some food or to get service on his computer, although after 9 months he had difficulty recalling exactly what happened on each day and why he did certain things.  (Tr. 623-624);

10. From 12:21 p.m. until approximately 12:30 p.m., Mr. Ness was on a phone call with another HSP technician. (Company Exhibit #11);

11.  Mr. Ness was at the Holiday for a few minutes and then drove to Johnny Cake Ridge Park, where he completed his paperwork for Laurel Court at 12:40 p.m. and went on his lunch break.  (Company Exhibit #4, pp. 21-22);

12.  It is clear that Mr. Ness was working on the Laurel Court job while he was at the Kwik Trip from approximately 11:38 a.m. to 12:21 p.m.  The time was needed to research parts, order parts, create a new work order, and complete his work order.  There is nothing in the record to prove in any way that Mr. Ness was not working when he was at the Kwik Trip.  If Mr. Lefrooth would have taken one minute to call or text Mr. Ness to ask what he was doing at the Kwik Trip, Mr. Ness would have been able to explain exactly what he was doing.

The Union argues that the Company's claim that Mr. Ness was falsifying his timesheet and neglecting his duty relative to the Embry Path job is equally without merit.  The termination letter alleges that Mr. Ness falsified his timesheet relative to this job because Mr. Lefrooth observed Mr. Ness, via his GPS supervisor's screen at East View Park Johnny Cake Road from 1:31 p.m. to 2:14 p.m. when his MDT records showed him being on site at Embry Path.  However, the record reflects that Mr. Ness was on his lunch break at the park from approximately 12:40 p.m. to 1:25 p.m., that he went en route to the job at 1:25 p.m. and that he arrived at the job at 1:44 p.m.  The Company's GPS records show that he remained at the park until approximately 1:40 p.m., and Mr. Ness does not dispute that he may have stayed at the location after going en route to check out the history of the work order.  (Company Exhibit #4, p. 23; Union Exhibit #2).

42

The Union further argues that nothing in the records
suggest that Mr. Ness was not doing work on the job at Embry
Path, and the GPS records show a gap of approximately 1 hour –
from 1:40 p.m. to 2:39 p.m. when the GPS coordinates were not
transmitting.  Accordingly, the Company's claim that Mr. Ness
remained at the park until 2:17 p.m. are unfounded.  The fact is
that Mr. Lefrooth's GPS screen simply continued to show Mr. Ness
at the park because his computer was not transmitting and it
will always show the last point it received a signal until a new
signal is received.  In this case the new signal was not until
2:39 p.m.  What the GPS records do show is that the signal
stopped when Mr. Ness left the park at 1:40 p.m. and that he
entered that he was on site at 1:44 p.m.  (Union Exhibit #2).
Again, the Union claims that Mr. Lefrooth's GPS screen was wrong
and if he had taken one minute to call or text Mr. Ness about
the job at Embry Path, he would have understood that Mr. Ness
was not doing anything improper, that he was not being dishonest
and that he was not neglecting his duty.

It is undisputed that Mr. Ness completed all work assigned
to him while onsite at the customer's homes on the days in
question.  However, based upon the foregoing, when the
Arbitrator compares the Company's position that over the course
of four days in July and August of 2015, CenterPoint's GPS
records show that Mr. Ness spent approximately six hours

neglecting his job duties and/or wasting time to the Union's
position that Mr. Ness was always performing his related job
duties whether onsite, in a park, gas station, or elsewhere
during the days in question, the conclusion is inescapable that
on some occasions, but not all occasions totaling six hours, Mr.
Ness spent an excessive amount of time at locations rather than
onsite without a valid explanation as to what work he was
performing during these times.

During the hearing, Mr. Ness admitted that he does not have
a specific memory as to what he did on each of the days in
question, but denies any wrongdoing.  What is more troubling
than a lack of memory is his explanation for his whereabouts on
the days in question has continued to shift depending on the
evidence against him.  Initially, Mr. Ness denied ever being at
parks, gas stations or other off-site locations shown on Mr.
Lefrooth's GPS records.  Then, after learning about the accuracy
of GPS, Mr. Ness admitted that he was at these locations, but
insisted that it was not for the length of time denoted on the
GPS records gathered by Mr. Lefrooth.  Then, in another shift,
when GPS records from CenterPoint's computer server confirmed
that Mr. Lefrooth's GPS records were accurate, Mr. Ness
acknowledged that the time and location were somewhat accurate,
but insisted for the first time that he was working during this
time.  While it is true that the Company cannot rely on GPS

alone to prove that Mr. Ness was guilty of being dishonest or neglect of duty the explanations given by Mr. Ness and/or the Union for his whereabouts were not always sufficient to explain his whereabouts or the nature of his work on some of the days in question.

It is also troubling to the Arbitrator concerning Mr. Ness' claim in his testimony that he called his dispatcher on the telephone during some or all of the days in question, and that his dispatcher told him to "sit tight" - meaning there was no available work for him. However, when presented with his cellphone records, Mr. Ness could not explain why there were no calls to or from his dispatcher. Also, there is no other evidence that Mr. Ness used another form of communication to contact dispatch, such as texting. Mr. Ness knew that CenterPoint expected him to go on "standby" status when he was finished with a job (so that he could be dispatched more work), and he attempted to cover up his failure by claiming that he called his dispatcher to request more work.

The Company's actions or lack of actions are also troubling to the Arbitrator. It is undisputed that Mr. Lefrooth never contacted Mr. Ness or even attempted to contact Mr. Ness when he allegedly suspected that Mr. Ness was not where he should be on the days in question. The evidence established that Mr. Lefrooth had contacted other employees in situations where they

did not appear to be where they should have been based on his supervisor's screen showing Service Techs' GPS locations, but he never once tried to call, text, e-mail, or otherwise contact Mr. Ness when he believed Mr. Ness was at a location other than where he should have been.  Thus, it appears that Mr. Lefrooth engaged in the disparate treatment of Mr. Ness, but there is no convincing evidence that Mr. Lefrooth's discriminated against Mr. Ness on the basis of his Union affilation as a Union Steward or his age at 58 years old (protected age group), which is prohibited under Article 1, Recognition, and Article 25, Mutual Pledges, Section 4, Discrimination, of the Contract.

Had Mr. Lefrooth contacted Mr. Ness on the days in question, Mr. Ness would have had a timely and appropriate opportunity to explain his whereabouts that were being questioned by Mr. Lefrooth.  One would reasonably expect a supervisor to extend this courtesy to all Service Techs, especially Mr. Ness, who for over 20 years had been employed by the Company and had an excellent work and discipline record.  Clearly, Mr. Lefrooth's behavior is so far at variance with what would constitute reasonable supervision of an employee, and so far at variance with how other employees had been treated in the past. Since Mr. Ness had no prior history of "dishonesty," "falsifying timesheets" or "neglect of duty", one would normally expect the Company to look for a way to retain such a long-term, excellent

employee and not for a way to terminate him from his Service Tech position.

Former Union President Ian Brown testified that the Company's decision to terminate Mr. Ness is also so far at variance with the way other employees were treated when they actually engaged in proven misconduct, that the only explanation is that the Company wanted to terminate Mr. Ness for reasons other than his conduct. (Tr. 422-439). In fact, the record reflects numerous situations where employees were found to have engaged in conduct proven to be much more egregious than the Company has alleged against Mr. Ness, yet those employees were simply given warnings or at most short suspensions. It was only after numerous warnings that such individuals were terminated. (Union Exhibits #4-13).

It was firmly established that the supervisor's screen was only accurate when Mr. Ness' computer had service and was capable of sending information through to the supervisor and to the extent the supervisor refreshed his screen. Yet, it is troubling to the Arbitrator that the Company did not fully recognize in Mr. Ness's case that for approximately a year and one-half prior to his termination he had experienced continuous problems with being unable to connect his computer to the Company's server. As such, he was continually having difficulty receiving work orders and researching work orders and

transmitting completed work to the Company's server, which was frustrating to him.

Mr. Ness found that there were certain locations within his work area where he was able to get a good internet connection and other areas where he was unsuccessful. As such, Mr. Ness would often be required to drive to a particular location, such as a park or gas station in order to receive and transmit information on his laptop. Mr. Ness was not sure why he was having so much trouble with his laptop and he went to the individuals responsible for the equipment on several occasions for assistance. The solution that was attempted on three separate occasions during the last one and a half years of his employment was to provide him with a different computer. This approach, however, did not make a difference and he continued to have problems.

Unfortunately for Mr. Ness, it was until after his termination and his truck being assigned to a Master Service Tech named Tim Boettcher that the computer communication problems were resolved. As soon as Mr. Boettcher began using Mr. Ness' truck, he also began to experience a great deal of difficulty receiving and transmitting through the laptop. After some time, Mr. Boettcher went to the shop and found an individual who discovered that a small switch hidden underneath the seat or somewhere in the truck, that determined whether the

computer in the docking station of the van would transmit information via the computer's internal antennae or the external antennae of the truck to which it would be connected through the docking station. It was found that the switch had been set for the internal antennae rather than the preferred and longer range external antennae, which resolved many of the communication problems with the computer.

The Company has asserted that the Arbitrator lacks the authority or jurisdiction to modify the penalty imposed on Mr. Ness if he finds that Mr. Ness was guilty of dishonesty or neglect of duty on some or all of the days in question based on the language of Article 26, which states that "Dishonesty" and "Neglect of Duty" are two of the four "absolute causes from which there shall be no appeal to negotiation or arbitration between the Company and Union (except that the question of whether the employee has been guilty of the facts constituting such absolute causes shall be a negotiable controversy)."

The Union denies that the language of Article 26 prohibits the Arbitrator from reviewing the propriety of a penalty assessed against an employee found to have committed one or more of the "absolute cause" offenses set forth therein. The Arbitrator so agrees.

In reviewing the language of Article 26, it is clear that the Parties did not intend that any employee found to have

committed one of the four listed offenses could be summarily

discharged without regard to the factors arbitrators normally

consider in determining whether there was just cause for

discharge, such as:

1.  The nature of the offense;

2.  The employee's conduct;

3.  The employee's past work record;

4.  The employee's length of service with the Company;

5.  Whether the employee had been afforded due process and
    a fair investigation;

6.  Whether the Company had been lax in enforcement of the
    rule for which the employee was being disciplined; and

7.  Whether the employee was being treated unfairly or
    discriminatorily with respect to the discipline
    received by other employees for violation of the same
    rules.

Elkouri and Elkouri, How Arbitration Works at 964-1000 (6th Ed.,

2003).  To interpret Article 26 in any other manner would

violate all of the basic notions of fairness and due

process firmly established in the history of industrial

relations and implicit in Article 26, which also includes a

just cause standard for discipline and discharge.

If the Company's interpretation of Article 26 were to be

upheld, an employee guilty of almost any violation of Company

policy, no matter how insignificant, could be subjected to

summary discharge without the right to challenge the

appropriateness of the penalty before an arbitrator.  That is
because almost every violation of Company policy could also be
interpreted to constitute an act of neglect of duty or
dishonesty.

Given that the Parties included a just cause standard in
Article 26, it seems unreasonable to think the Union would have
agreed to language with gives the Company the unfettered right
to discharge for any act of neglect of duty, dishonesty, abuse
of sick leave, or use of alcohol or non-medical drugs.

Moreover, the Company's position has been rejected by other
arbitrators dealing with this same issue.  For example, in the
case of the discharge of Dan Stephens, Arbitrator Jeff
Jacobs stated on pages 20-22 as follows:

> The employer's main argument is that the grievant's actions
> constituted one of the stated absolute causes for
> termination set forth in Article 26.  The employer asserted
> that it gets to determine if an employee's action equate to
> an absolute cause and that once that is done it takes it
> out of the purview of a traditional just cause analysis and
> allows only a determination of whether the facts as alleged
> occurred.  Here, as noted above, in neither of the two
> incidents relied upon as absolute causes for the
> termination was there an adequate, showing of true neglect
> of duty, Several things were problematic in this regard.
>
> First, if carried to its logical conclusion the employer's
> argument that the CBA language allows a unilateral
> determination of whether a given set of facts rises to the
> level of an absolute cause would effectively negate the
> just cause provision of the labor agreement.  Such a result
> would effectively, amount to a forfeiture of the just cause
> provision, of the contract by allowing the employer to
> unilaterally and without arbitral review, simply call
> something an "absolute cause" and thus remove a

disciplinary decision from most of the review.  This is not only disfavored by the great weight of arbitrators but is also not the way these patties have administered their agreement.  It is also inconsistent with several prior awards between these parties.

Further, virtually any violation, of a work rule could, using the employer's definition, equate to "neglect of duty" and be taken out of the just cause analysis.  Under the terms of this language such would be a perversion of the language and the contractual intent, which is very strongly in favor of allowing arbitral review under a traditional just cause analysis for alleged infractions leading to disciplinary action,

In Minnegasco v. Gas Workers, Union 4340, FMCS 88-04327, (Flagler 1988) the arbitrator was faced with a similar argument and what appeared to be the same language, Fiagier similarly rejected the notion that the facts limited his review and further defined the term "neglect of duty" as a "unreasonable failure to either perform an acceptable part of the calls assigned to the grievant during the time of his departure from the Company yard ... or to promptly notify his supervisor of his need to be relieved of his duties due to willful neglect?"  The operative terms here are the words "unreasonable failure and willful neglect."  Similar to the findings by Arbitrator Flagler, simple poor performance does not equate with true neglect of duty.

The Company has failed to prove that Mr. Ness was guilty of dishonesty or neglect of duty for a total of six hours on the days in question.  However, the Arbitrator concludes that Mr. Ness is guilty of dishonesty or neglect of duty on some of days in question, but must find that the discharge penalty imposed on Mr. Ness was arbitrary and discriminatory and must be modified to comport with the seriousness, length and scope of his misconduct.  The appropriate remedy is reinstatement with no back pay.

**AWARD**

Based upon the foregoing and the entire record, the grievance is sustained in part and denied in part.  Within twenty (20) business days of the receipt of this Award the Company shall reinstate the Grievant, Mark Ness, to his former Service Tech position without any back pay.  The effective date of his termination to his date of reinstatement shall be construed as a disciplinary suspension without any back pay. All other remedies sought by the Union, on behalf of the Grievant, are hereby denied.

*Richard John Miller*

Dated September 15, 2016, at Maple Grove, Minnesota.